REQUESTED BY: Todd C. Sneller, Administrator Nebraska Ethanol Board
This is in response to your request for an opinion from the Attorney General on the legality of a proposed business structure for an integrated biorefinery complex, as it pertains to ArticleXII, Section 8 of the Nebraska Constitution, commonly referred to as Initiative 300.
 BACKGROUND
As you explained in your opinion request, the applicants for this proposed project desire to a form a limited liability company that would develop, finance, construct, and operate a commercial demonstration of patented technology, which integrates a modified ethanol unit with a co-located cattle feedlot and proportionately sized anaerobic digestion system. Such a facility would not only produce ethanol and finished cattle, but would also convert animal manure and other low-value feedstocks into both biogas and bio-fertilizers.
You stated that sufficient biogas would be produced to operate the ethanol production process, thereby eliminating the need for purchased natural gas. Also, you indicated that the combination of substantially reduced energy use via elimination of distiller grains (DDGS) drying, elimination of DDGS rail load-out and transport expenses, and the substitution of biogas for purchased natural gas could potentially reduce conventional ethanol production costs by approximately 25 to 35 cents per gallon of ethanol, depending on the fluctuation of natural gas prices.
By combining an ethanol production facility with a cattle feedlot, both the waste and externalities produced from each facility are utilized and mutually beneficial to the other. The byproducts of the ethanol production facility result in both a protein rich base used as feed for cattle, and ethanol, which when mixed with gasoline provides an alternative fuel source to power motor vehicles. The byproducts of the cattle feedlot are manure, from which methane rich biogas can be burned to heat boilers for the ethanol plant, and finished cattle ready for processing into food. Additional byproducts from the biorefinery process are produced when separating out nitrogen, phosphorus and potassium from the manure for later use as agricultural fertilizer. Also as you indicated, the ethanol plant would save money by not having to dry the protein rich base for shipping because the feed can be taken directly to the adjoining feedlot in its wet state without a concern for spoilage.
The proposed company will be exploring the first commercial demonstration of this patented technology at one or more existing feedlots in Nebraska. As you stated, insertion of a modified biorefinery ethanol and anaerobic digestion system into one of these feedlots will involve a total project cost of approximately $40 to $50 million. In order to secure financing and eliminate lender concerns about the security of its collateral, you believe it is necessary for all three subsystems to be under common ownership. It is anticipated that the ultimate owner entity will have a limited liability structure, and if the production process is successful, it could potentially have as many as 300 to 400 farmer investors.
As you mentioned, in order to help secure financing the Nebraska Ethanol Board is requesting a formal opinion from the Attorney General to confirm that the proposed business structure does not violate the provisions of Article XII, Section 8. You are of the belief that the operation could be considered experimental to the extent that the company undertakes to commercially demonstrate the feasibility of such an integrated complex in Nebraska, and since the entity will operate as a custom feedlot, the commercial sales of finished cattle from the feedlot will go to the account of the cattle owners and not the company, thereby resulting in only an incidental benefit to the company. It is understood that the operation itself will not own the cattle at the custom feedlot.
 ANALYSIS
Article XII, Section 8 of the Nebraska Constitution prohibits corporate farming in the State of Nebraska unless the activity is permitted under one of the exclusions contained within the section. "No corporation or syndicate shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state, or engage in farming or ranching." Neb. Const. art. XII, § 8(1). Under this initiative amendment to the constitution, a corporation is defined as, "any corporation organized under the laws of any state of the United States or any country or any partnership of which such corporation is a partner." Id.
A syndicate under this state constitutional provision is defined as:
 . . . any limited partnership organized under the laws of any state of the United States or any country, other than limited partnerships in which the partners are members of a family, or a trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred according to the rules of civil law, or their spouses, at least one of whom is a person residing on or actively engaged in the day to day labor and management of the farm or ranch, and none of whom are nonresident aliens. This shall not include general partnerships.
Neb. Const. art. XII, § 8(1). Under Nebraska law, a limited liability company is considered a syndicate for the purposes of Article XII, Section 8.
 (2) A limited liability company organized pursuant to the act shall be deemed to be a syndicate for purposes of Article XII, section 8, of the Constitution of Nebraska, except that a limited liability company in which the members are members of a family, or a trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred according to the rules of civil law, or their spouses, at least one of whom is a person residing on or actively engaged in the day-to-day labor and management of the farm or ranch, and none of whom are nonresident aliens, shall not be deemed to be a syndicate for purposes of Article XII, section 8, of the Constitution of Nebraska.
Neb. Rev. Stat. § 21-2602 (Reissue 1997).
Two issues that need to be addressed in order to determine if the activity of the proposed biorefinery complex violates Article XII, Section 8, are as follows: 1) whether the ownership of the adjoining feedlot constitutes farming or ranching under the Article; and, if it does, then 2) is the proposed business structure exempted under one of the fourteen exclusions included within the Article.
First, does the use of a feedlot to provide manure as a biogas fuel source for the production of ethanol come under the definition of farming included within the Article, particularly if the use of the feedlot also results in the production of finished cattle? Article XII, Section 8 defines farming or ranching to include, "the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or (ii) the ownership, keeping or feeding of animals for the production of livestock or livestock products." Neb. Const. art. XII, § 8. (Emphasis added).
In the biorefinery complex proposal, cattle will be fed at a co-located custom feedlot for the purpose of collecting manure to be used in the anaerobic digestion system. The anaerobic digestion system will produce methane rich biogas to fuel the ethanol production process. As an indirect result of collecting the manure, finished cattle will be available for the production of livestock products. Although the cattle will not be owned by the company under the custom feedlot scenario as described, the cattle will be kept and fed as an indirect result of the entity extracting biogas.
The manner in which courts construe language found in constitutional provisions, is described in Hall v. Progress Pig, Inc., 259 Neb. 407,610 N.W.2d 420 (2000).
 In ascertaining the intent of a constitutional provision from its language, the words must be interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests that they are used in a technical sense. The court may not supply any supposed omission, or add words to or take words from the provision as framed. It must be construed as a whole, and no part will be rejected as meaningless or surplusage, if it can be avoided. If the meaning is clear, the court will give to it the meaning that obviously would be accepted and understood by the layperson.
259 Neb. at 414, 610 N.W.2d at 427. (Citations omitted).
In the present matter, feeding and keeping livestock would be interpreted in their most natural and obvious meaning. The action engaged in by the proposed biorefinery complex, which involves the feeding and keeping of cattle, does fit within the category of farming described within Article XII, Section 8. Even though the proposed entity would not engage in the actual ownership of cattle, the fact that the entity will participate in the feeding and keeping of cattle is ranching for the purposes of the constitutional provision.
The next issue discussed is whether the proposed business structure is exempted under one of the fourteen exclusions included within the Article's language. Although these exclusions are too numerous to address and identify each one, we will review the relevant exclusions given the proposed business description contained in your request. Basically, you indicated that there is a preference for all three subsystems (ethanol production, anaerobic digestion system, and custom cattle feedlot) to be under common ownership in order to secure financing and eliminate the lender's concerns about the security of its collateral.
Given this preference for common ownership by a non-family limited liability company, it is the opinion of the Attorney General that exclusion E of Neb. Const. art. XII, § 8, concerning a farm or ranch operated for experimental objectives, would apply to the proposed entity described in your request, that is if all the conditions contained within the exclusion are adhered to by the proposed entity.
Exclusion E permits non-family corporate and syndicate farming by providing, "[t]hese restrictions shall not apply to: (E) A farm or ranch operated for research or experimental purposes, if any commercial sales from such farm or ranch are only incidental to the research or experimental objectives of the corporation or syndicate." Neb. Const. art. XII, § 8(E). Given the language of exclusion E, if the entity in question is operated, 1) for an experimental purpose, and 2) any commercial sales from such farm related activity are incidental to the experimental objectives, then the non-family owned company may engage in the farming activity.
The word `experiment' is defined by Black's Law Dictionary 578 (6th ed. 1990), as, "[a] trial or special test or observation made to confirm or disprove something doubtful. The process of testing." Merriam-Webster's Dictionary online, www.m-w.com/cgi-bin/dictionary, defines the word `experimental' as: "1 : of, relating to, or based on experience or experiment; 2 a: serving the ends of or used as a means of experimentation . . . b: relating to or having the characteristics of experiment." To the extent that the functioning of the proposed biorefinery complex serves the ends or is used as a means of experimentation then such a facility could be categorized as experimental under the terminology referred to by exclusion E.
According to an article written by David Rogers, New Plant May Sprout in South Dakota, Wall Street J. A4 (August 16, 2002), as of the date of publication there were no biorefinery complexes of this type built in the United States. You also confirmed this fact in a subsequent phone conversation with our staff that no such facilities have been built to date. Because the feasibility of such an operation has not yet been clearly established, and because no biorefinery complex has so far been built, it is reasonable to categorize such a facility to be constructed in Nebraska as experimental, under the usage described in exclusion E, and that the facility would be operating for an experimental purpose.
In addition, for exclusion E to apply any commercial sales relating to the farming activity must be incidental to the experimental purpose. `Incidental' is defined by Black's Law Dictionary 762 (6th ed. 1990), as, "[d]epending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal; something incidental to the main purpose." The main purpose of the ethanol plant and biorefinery complex is to produce methane rich biogas, which in turn is used to produce ethanol. Although the feeding of cattle is an important component in this process, it is also reasonable to conclude that such activity is not the main purpose of the facility, and is incidental. Therefore, any commercial sales resulting from the incidental farming activity could be properly categorized as incidental.
It is apparent that the proposed facility you described fits within the confines of exclusion E as operating for an experimental purpose, and that the farming activity and resulting commercial sales from the cattle feedlot would be incidental. To the extent that the custom feedlot is also operated in a manner where the costs charged to the owners of the cattle reflect the actual costs borne by the custom feedlot for the feeding and keeping of the cattle, and that such charges do not involve a premium or additional profit on top of the actual costs, then the finding that such sales are incidental is the proper result.
 CONCLUSION
Based upon the proposed business structure for an integrated biorefinery complex as you described in your opinion request, such entity can be reasonably found to be covered under exclusion E of Article XII, Section 8, pertaining to a farm or ranch operated for experimental objectives. Such exclusion applies to the extent that the entity can be characterized as experimental, and all commercial sales from such farm or ranch activities are incidental to the experimental objectives.
Sincerely,
 JON BRUNING Attorney General
 Jason W. Hayes Assistant Attorney General
Approved:
_______________________ Attorney General